UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| JACOB C. BRIER, | |
| Plaintiff, | |
| v. | CAUSE NO. 3:24-CV-1006-GSL-JEM |
| JASON SMILEY, et al., | |
| Defendants. | |

OPINION AND ORDER

Jacob C. Brier, a prisoner without a lawyer, filed a complaint alleging he suffers from a serious mental illness. ECF 1. He was transferred to Westville Control Unit ("WCU") in February 2024, after he attacked an officer during a mental health crisis. He indicates he was hallucinating and believed the officer intended to kill him. He complains about the conditions of his cell and the adequacy of his physical and mental health care.

He filed a motion for preliminary injunction asking that he be released from segregation because he does not believe he can receive the mental health care he needs while in segregation. ECF 3. He believes he should be placed in a unit designed to treat inmates with serious mental health conditions. *Id.* In later filings, Brier suggests that the correct remedy is to order that he be moved to general population. ECF 12; ECF 27.

Brier's complaint alleges that his mental health deteriorated while in WCU. When he sought help form Tori Halcarz, she directed him to pray for forgiveness for hurting the correctional officer he attacked prior to his transfer to WCU. He reports

having auditory hallucinations, cutting himself, and slamming his head on the walls and door to try to get the voices to stop. On one occasion, Brier alleges that Halcarz, Tracy Cornett, and Correctional Captain Mr. Rippe stood at his door and watched Brier hit his head until he blacked out. Rippe was laughing. Brier begged Rippe for help, but he offered no assistance.

Brier indicates that he tried to kill himself by swallowing thirty pills.[1] He woke up in a puddle of vomit and told Halcarz, Cornett, and Rippe what he had done. Cornett responded by saying, "[Y]ou['re] alive so it couldn't have been serious." *Id*. at 4. Brier wrote Warden Smiley, Ms. Bridegroom, the mental health director at Westville, and a "slew" of others begging for help. *Id.* He received no response.

At some point, Brier indicates he attempted to hang himself, but the rope snapped and he woke up bleeding from his head. Nurse Katie Jacobs and Correctional Officer Ms. Clemens were standing at his door looking at him. Jacobs asked, "What the fuck are you doing?" *Id.* at 5. She also said, "You fucking idiot[.] I'm not doing the paperwork[.]" *Id.* Brier tried to stand up, but the rope was still choking him, and he fell. Jacobs stated, "[F]uck him[. H]e just wants attention[.] I'm definitely not doing the paperwork[.] I'm not calling mental health either[. H]e can fucking die for all I care[.]" *Id.* Mr. Clemens then allegedly said, "[Y]ou hear that you retarded fuck you['re] not getting your medication and we're not calling mental health[.] Kill yourself[. T]hen the

---

[1] He does not indicate when this occurred or what kind of pills he swallowed.

2

voices will be the least of your worries." *Id.* They walked away. He was losing lots of blood and blacked out several times.

When he awoke the next day, he completed a medical request form to give to the nurse when medications were passed out. When Ms. Jenkins passed out meds, she said "I heard what happened yesterday from Katie[. W]hat the fuck is wrong with you stupid white motherfuckers[? A]ll ya'll crazy and ya'll want to kill yall self." *Id.* at 5-6. She laughed. Brier asked her to take his health care request slip and indicated he needed medical attention for a gash and that he was still suicidal and needed to see mental health. Her response was allegedly as follows:

> I'm a tell you the same thing I tell the rest of these crazy white motherfuckers[. I]f you cut yourself or do something to fuck yourself I'm not cleaning that shit up[. Y]ou did it to yourself[. Y]ou['re] not dead or dying so you will be fine and I'm not taking that slip[. D]o you want your medication or not?

*Id.* at 6. She left before Brier could respond.

Brier reports that his mental health continues to deteriorate, and his efforts to obtain help have been fruitless. Brier argues that segregation itself has caused his mental health to worsen, and he cannot obtain the help he needs while housed in segregation.

Based on these allegations, Brier was granted leave to proceed against Warden Smiley in his official capacity for permanent injunctive relief to receive constitutionally adequate mental health treatment, including non-segregated housing, consistent with the Eighth Amendment. ECF 10 at 15.[2] Warden Smiley was ordered to respond to the

---
[2] Brier is proceeding on other claims as well, but Brier's motion for preliminary injunction concerns only this claim. *See* ECF 10 at 14.

3

request for preliminary injunction and file an affidavit or declaration with the court, explaining how Brier's serious mental illness is being treated in a manner that comports with the Eighth Amendment's requirements, and an explanation of Brier's placement in long-term segregation despite the risks this poses to inmates with serious mental illness. ECF 10 at 16. In response, Warden Smiley submitted a 22-page response, an affidavit, IDOC records, and mental health records. ECF 13. Brier was granted an opportunity to file a reply. ECF 10 at 16. He did not file a reply[3] by the deadline, although he indicates that he did not receive the response in time to meet the deadline. ECF 24. He filed a motion to strike Warden Smiley's response and impose sanctions. ECF 24. He also filed a motion for default judgment on the request for a preliminary injunction or temporary restraining order. ECF 27.

*Motion to Strike Warden's Response and Issue Sanctions*

Brier indicates that, even though Warden Smiley's response was filed with the court on February 7, 2025 (ECF 13), he did not receive it until February 24, 2025 – the day before his response was due. He attaches a document showing that mail from defense counsel was received by staff on February 21, 2025, in support of his allegations. It is unclear why it took over two weeks for mail to reach Brier,[4] but the remedy is not to strike the response or impose sanctions. Because neither striking the

---

[3] The Warden filed an initial response to the request for preliminary injunction prior to this court's screening of the complaint. ECF 9. Brier did file a reply to that response, and it will be considered by the court. ECF 12.

[4] Brier speculates that the defendants delayed his mail on purpose, but he has produced no evidence suggesting that is the reason for the delay.

4

response nor imposing other sanctions is appropriate here, the motion (ECF 24) will be denied.

*Motion for Default Judgment for Preliminary Injunction/Temporary Restraining Order*

Brier also seeks to gain the preliminary injunction he seeks through default. This motion was filed before Brier received a copy of Warden Smiley's response. He argues that an injunction should be granted because Warden Smiley's earlier response (ECF 9), filed after the court notified Warden Smiley that Brier's complaint alleged that he was suicidal, was not proper. Brier believes the response was improper because there are disputes of fact regarding a variety of issues. Preliminary injunctions and temporary restraining orders are not won by default. Furthermore, a response is not improper merely because Brier disputes some of the assertions contained in it. Therefore, this motion (ECF 27) will also be denied.

*Request for Preliminary Injunction*

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

As to the first prong, "the applicant need not show that it definitely will win the case." *Illinois Republican Party v. Pritzker*, 973 F.3d 760, 763 (7th Cir. 2020). However, "a mere possibility of success is not enough." *Id.* at 762. "A strong showing . . . normally includes a demonstration of how the applicant proposes to prove the key elements of its case." *Id.* at 763 (quotation marks omitted).

As to the second prong, "[i]ssuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with . . . injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22. "Mandatory preliminary injunctions – those requiring an affirmative act by the defendant – are ordinarily cautiously viewed and sparingly issued [because] review of a preliminary injunction is even more searching when the injunction is mandatory rather than prohibitory in nature." *Mays v. Dart*, 974 F.3d 810, 818 (7th Cir. 2020) (quotation marks omitted).

Additionally,

> [t]he PLRA circumscribes the scope of the court's authority to enter an injunction in the corrections context. Where prison conditions are found to violate federal rights, remedial injunctive relief must be narrowly drawn, extend no further than necessary to correct the violation of the Federal right, and use the least intrusive means necessary to correct the violation of the Federal right. This section of the PLRA enforces a point repeatedly made by the Supreme Court in cases challenging prison conditions: Prison officials have broad administrative and discretionary authority over the institutions they manage.

*Westefer v. Neal*, 682 F.3d 679 (7th Cir. 2012) (quotation marks, brackets, and citations omitted).

The Warden has explained in detail why Brier was placed in department-wide restricted housing at WCU. Brier is serving a sentence due to convictions of violent felonies, including shooting his father in the hand and an acquaintance in the foot. ECF 13-1 at 3; ECF 13-2 at 44-50. Since being transferred to the IDOC's custody on July 16, 2021, he has received three class A disciplinary convictions, sixteen class B convictions, and two class C convictions. ECF 13-1 at 3. He was placed in the restrictive housing unit at Pendleton Correctional Facility on March 23, 2023, after he threw scalding water from his hotpot onto a correctional officer who was passing by his cell. *Id.* While in restrictive housing at Pendleton, he continued to receive disciplinary conduct reports. *Id.* at 2. In 2023, he was convicted of three assaults on correctional staff, including assault with bodily fluids and fecal waste. *Id.;* ECF 13-2 at 3, 23-24. He also had nine class B violations, including threats against staff, drug use, and unauthorized financial transactions. ECF 13-1 at 3. Additionally, he had a class C violation for abusing visitation, mail, or telephone privileges. *Id.* The warden at Pendleton asked that Brier be transferred from facility level restrictive housing to department-wide restrictive housing because of his continued disciplinary violations.[5] *Id.* at 2; ECF 13-2 at 25-38. Despite this history, Brier asserts that he "doesn't have a history of violence in prison." ECF 12 at 2.

---

[5] While in WCU, Brier has faced conduct allegations for intoxication, refusal to take drug tests, and threatening staff, although it does not appear that he has been found guilty of these offenses. *Id.* at 3; ECF 24 at 2. These charges have not been considered in ruling on the request for a preliminary injunction and temporary restraining order.

Before being transferred to WCU, a psychologist assessed Brier and determined that he was not at a high risk to decompensate if placed in a secure unit. ECF 13-2 at 4. Upon arrival at WCU, he was assessed again but refused to participate. ECF 13-3 at 1-9. This was noted to be consistent with Brier's refusal to participate in mental health treatment when at Pendleton. *Id.* at 6. He has not been prescribed psychiatric medication since 2013. *Id.* at 1-4. Notes indicate his SMI diagnosis was resolved on February 22, 2024, but he would continue to receive the same treatment as he received as an inmate with a SMI for twelve months, in accordance with policy. *Id.* at 6. During this period, mental health personnel checked on Brier every three days at his cell. *Id.* at 5. During those check-ins, Brier could request an out-of-cell counseling session. *Id.* He also received two out-of-cell mental health evaluations per month. *Id.*
At the time of Brier's transfer, he had no active mental health diagnosis, although he had a mental health classification of "C", meaning a psychiatric disorder that causes some functional impairment. *Id.* at 12.

A report from an October 28, 2024, out of cell mental health visit indicates Brier did not report any mental health concerns. ECF 13-3 at 14. Additionally, there were no signs of psychosis or delusions. *Id.* On November 8, 2024, Brier was offered an out of cell mental health session and declined. *Id.* at 18. He did not report any mental health concerns. *Id.* Brier placed his complaint in the prison mailbox on December 14, 2024, which indicated he was suicidal and needed mental health treatment. ECF 1 at 10. Yet, just three days later, on December 17, 2024, he again declined an out of cell mental health meeting, reporting no immediate mental health concerns. *Id.* at 23. Warden

8

Smiley was promptly notified of Brier's threat of suicide on December 27, 2024, the same day that the complaint was docketed. ECF 4; ECF 5. The following day, a member of the mental health staff checked on Brier at Warden Smiley's request. ECF 13-3 at 26. Brier refused to leave his cell, stating that he did not know why he needed to leave if there was nothing wrong with him. *Id.*

In response to Warden Smiley's assertion that Brier has consistently failed to present his mental health needs when offered services, Brier noted in his January 10, 2025, rebuttal to the warden's response (ECF 12 at 3), that he has reported his problem to the court now even if he has not reported it to mental health workers previously. And yet, even after Brier filed his complaint, he continued to decline the mental health care that was offered to him. ECF 13-3 at 26.

As noted in this court's screening order (ECF 10), to prevail on an Eighth Amendment claim for constitutionally inadequate medical care, Brier must show that he suffered from an objectively serious medical need and the defendant acted with deliberate indifference to that medical need. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). Deliberate indifference means that the defendant "acted in an intentional or criminally reckless manner, i.e., the defendant must have known that the plaintiff was at serious risk of being harmed and decided not to do anything to prevent that harm from occurring even though he could have easily done so." *Board v. Farnham*, 394 F.3d 469, 478 (7th Cir. 2005). For a medical professional to be held liable for deliberate indifference to an inmate's medical needs, he or she must make a decision that represents "such a substantial departure from accepted professional judgment, practice,

9

or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008). Inmates are "not entitled to demand specific care," *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 965 (7th Cir. 2019), nor are they entitled to "the best care possible." *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997).

"The consensus of opinion in a professional body of literature on the subject . . . is that segregation is detrimental for people with serious mental illness because it makes their symptoms worse or because, at best, they do not get any better." *Indiana Prot. & Advoc. Servs. Comm'n v. Comm'r, Indiana Dep't of Correction*, No. 1:08-CV-01317-TWP, 2012 WL 6738517, at *15 (S.D. Ind. Dec. 31, 2012). There is a growing recognition among courts regarding the harmful effects of segregation on inmates who are mentally ill. *See Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 666-67 (7th Cir. 2012) ("prolonged placement in segregation might have adverse effects on someone in Rice's condition"), *abrogated on other grounds in Kemp v. Fulton Cnty*, 27 F.4th 491, 494 (7th Cir. 2022); *Scarver v. Litscher*, 434 F.3d 972, 975-96 (7th Cir. 2006) ("There is an extensive literature on the effect of ... isolation ... on mentally disturbed prisoners."). Safety concerns may nonetheless necessitate isolation. "[T]he treatment of a mentally ill prisoner who happens also to have murdered two other inmates is much more complicated than the treatment of a harmless lunatic." *Id.* at 975-76.

Here, there is some question about whether Brier still qualifies as a SMI inmate at this time. Assuming for purposes of this order that he does, he has not carried the burden of demonstrating he is likely to succeed on the merits of his Eighth Amendment

claim for injunctive relief. Warden Smiley points out that the conditions at the WCU are rather different than those highlighted in the cases cited above. The prison classifies Brier's housing as "restricted," not "solitary." ECF 13-1 at 5. The court is not interested in quibbling over semantics. Brier is housed in a cell without a cellmate. *Id.* There is a window at the door and the back of the cell. *Id.* at 6. When in their cells, WCU inmates can converse with the inmates on either side of them. *Id.* They can also converse with any inmate who is on recreation, because those inmates are free to move around the unit and chat at other inmate's cell doors. *Id.* Likewise, Brier can approach other inmates to talk when he is on recreation. *Id.* Warden Smiley indicates that inmates receive recreation every day, which Brier disputes, but this is not material to the outcome of the request for a preliminary injunction.[6]

In addition to the ability to converse with other inmates in the WCU, each inmate has a tablet. *Id.* The tablet may be used any time during waking hours to make phone calls, send messages, play games, read, or watch movies. *Id.* Brier points out that an inmate must have funds available to purchases these services. ECF 24 at 2. It is unclear what services, if any, are available without a fee. Still, Brier does not allege that he lacks the funds necessary to purchase services on his tablet.

Warden Smiley asserts that, as an SMI inmate at WCU, Brier has had "*more* access to mental health resources than any other inmate has on a routine basis in any facility in the IDOC." *Id.* at 5. Brier disputes this. He asserts that, if he were housed in a

---

[6] Brier indicates recreation is given four days a week. ECF 24 at 1.

mental health unit, he would have access to group therapy, an individual treatment plan, and ten hours of therapeutic programing a week. ECF 27 at 2. He also notes that, if he were housed in general population, he would be permitted to have a meaningful job and access to programs and services that he does not have access to at WCU. ECF 12 at 2.

      Brier, however, is not entitled to the best mental health care possible, he is only entitled to constitutionally adequate mental health care. *Forbes*, 112 F.3d at 267. Housing SMI inmates in segregation or extremely restrictive environments long term is concerning, but a determination of whether it is permissible cannot ignore significant security concerns. Brier has a lengthy history of violence both out of prison and in prison, including serious assaults against other inmates and guards. While Brier may desire the opportunity for group therapy, the Eighth Amendment does not require that in person group therapy be provided to a mentally ill inmate who has a significant history of violence against both inmates and correctional officers. Likewise, there is no doubt that having a job and participating in programs could improve Brier's mental health but precluding an inmate with a history such as Brier's from participation until he has demonstrated he is able to conform his behavior to the rules is not impermissible. His claim that he needs more mental health care than he is currently receiving loses some of its credence when he repeatedly refuses the care that he is offered.

      After reviewing the records provided by the warden and each of Brier's filings, the court cannot find that Brier has shown that he is likely to succeed on the merits of

12

his claim for injunctive relief. Brier has been offered a great deal of mental health care. Although he not availed himself of it, the record does not suggest that future care will be unavailable to him in the absence of an injunction. He is not receiving the care he would like – which would require placement in a mental health unit or general population – but inmates are "not entitled to demand specific care," *Walker*, 940 F.3d at 954, nor are they entitled to "the best care possible." *Forbes*, 112 F.3d at 267.

Because Brier has not met his burden of demonstrating that he is likely to succeed on the merits of this case, the request for preliminary injunction contained in Brier's complaint (ECF 1) will be denied.

For these reasons, the court:

(1) DENIES Jacob C. Brier's Motion to Strike Warden's Response and Issue Sanctions (ECF 24);

(2) DENIES Jacob C. Brier's Motion for Default Judgement for Preliminary Injunction/TRO (ECF 27); and

(3) DENIES Jacob D. Brier's request for preliminary injunction or temporary restraining order (ECF 3).

SO ORDERED on March 31, 2025

/s/Gretchen S. Lund
JUDGE
UNITED STATES DISTRICT COURT